# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| SREDRICK JONES, as the surviving spouse of BRANDI NICOLE GRIFFIN JONES, | * * * * | |
| Plaintiff, | * * | NO. 5:17-cv-00077 |
| v. | * * | |
| WALLACE STEVE ANDERSON, D.O., in his individual and professional capacity; TAMMY NICHOLE BASS, LPN, in her individual and professional capacity; SOUTH GEORGIA CORRECTIONAL MEDICINE, LLC; KIM PHILLIPS, in his individual capacity; and DOYLE WOOTEN, in his individual and professional capacity, | * * * * * * * * * * * * * * | |
| Defendants. | * | |

## ORDER

Before the Court are three motions for summary judgment: Defendant Tammy Nichole Bass, LPN's Motion for Summary Judgment; Defendants Wallace Steve Anderson, D.O. and South Georgia Correctional Medicine, LLC's Motion for Summary Judgment; and Defendants Doyle Wooten and Kim Phillips's Motion for Summary Judgment. Dkt. Nos. 52, 53, 56. These Motions have been fully briefed and are ripe for review. For the following reasons, Tammy

Nichole Bass, LPN's and South Georgia Correctional Medicine's motions with respect to Plaintiff's federal law claims under 42 U.S.C. § 1983 are **GRANTED**. Plaintiff's state law claims against Tammy Nichole Bass, LPN, and South Georgia Correctional Medicine are **REMANDED** to the State Court of Coffee County. Kim Phillips's motion is **GRANTED**. Doyle Wooten's motion is **GRANTED**. Plaintiff's claims against Wallace Steve Anderson, D.O., are **DISMISSED**.

## BACKGROUND

This case arises from the death of Brandi Nicole Griffin Jones ("Mrs. Jones") after her detention at the Coffee County Jail.

### I.   **The Parties**

Mrs. Jones was an inmate of Coffee County Jail from July 8 to July 11, 2015. Nurse Bass's Statement of Undisputed Material Facts ("Dkt. No. 52-1") ¶ 1.[1] Doyle Wooten ("Sheriff Wooten") was the Sheriff of Coffee County at this time. Sheriff Wooten and Captain Phillips's Statement of Undisputed Fact ("Dkt. No. 56-1") ¶ 2.[2] Kim Phillips ("Captain Phillips") was the captain and jail administrator. Id. ¶ 75. Sheriff Wooten relied on Captain Phillips to maintain the day-to-day operation of the jail. Id. ¶ 89. Wallace Steve Anderson ("Dr. Anderson") and his company South Georgia Correctional Medicine, LLC, ("SGCM") entered into a

---

[1] Throughout this Order, the Court cites only those statements in Nurse Bass's Statement of Undisputed Material Facts that Plaintiff explicitly admits.
[2] Throughout this Order, the Court cites only those statements in Sheriff Wooten and Kim Phillips's Statement of Undisputed Material Facts that Plaintiff explicitly admits.

AO 72A
(Rev. 8/82)

contract with Coffee County to provide medical care to inmates at the Coffee County Jail. Dkt. No. 52-1 ¶ 5; Dkt. No. 56-1 ¶ 5-6; Dkt. No. 63-1 at 1. Tammy Nicole Bass ("Nurse Bass") was a licensed practical nurse employed by Dr. Anderson and SGCM at Coffee County Jail. Dkt. No. 56-1 at 5.

## II.  Mrs. Jones Detention at Coffee County Jail

On July 8th, 2015, at 6:45 p.m., Mrs. Jones was booked into the Coffee County Jail as a pre-trial detainee. Dkt. No. 56-1 ¶ 1. After being booked, Mrs. Jones was taken to see Nurse Bass who conducted her medical intake screening at around 10:50 p.m. Id. ¶ 12. Part of Nurse Bass's duties were to perform assessments on inmates when they first came into the jail and obtain their medical histories to determine the level of treatment, if any, that they required. Id. ¶ 9. Upon intake, Nurse Bass would fill out several documents, including a medical screening form, a suicide screening form, a consent for treatment, and a medical questionnaire. Id. ¶ 10. During her intake interview with Mrs. Jones, Nurse Bass filled out these documents, which included the Patient's Consent for Treatment that allowed the Coffee County Jail to obtain "all medical records and/or information, wherever located, including any hospital or medical doctor or another place

AO 72A
(Rev. 8/82)

where medical records may be located." Id. ¶ 12, 14, 17; Dkt. No. 60-3.

Nurse Bass indicated on the medical screening form that Mrs. Jones had been diagnosed with mental health conditions including: bipolar disorder, borderline personality disorder, and manic depression. Dkt. No. 60 at 47. She noted on the form that Mrs. Jones was treated by Dr. Khan and testified that she knew of Dr. Khan and the location of his facility. Id. Nurse Bass indicated on the form that Mrs. Jones had answered yes to the question of "[h]ave you taken or are you taking any medications prescribed to you . . . by a physician?" Id. at 51; Dkt. No. 60-1. She testified that she asked Mrs. Jones what those medications were and indicated her sole response further down on the form as "Subutex." Dkt. No. 60 at 51-52; Dkt. No. 60-1. Nurse Bass explained that she wrote Subutex under the section asking "Do you use drugs" indicating that the use was illegal because her understanding was that it was being "misused" since Mrs. Jones told her it was not prescribed to her. Dkt. No. 60 at 52. Nurse Bass testified that she did not know that Subutex could cause withdrawal syndrome. Id. at 39. Nurse Bass further testified that Mrs. Jones did not tell her what other medications she was taking at that time and explained that

her knowledge of patient information was limited to what patients told her. Id. at 52, 79.

Based on the intake interview, Nurse Bass decided that Mrs. Jones's supervision would be routine. Dkt. No. 56-1 ¶ 19. She noted on the intake form that Mrs. Jones said she did not have any history of drug or alcohol abuse. Id. ¶ 18. Nurse Bass also testified during her deposition that while filling out the medical forms during intake, she did not notice Mrs. Jones exhibit any symptoms of withdrawal from drugs or alcohol or any signs of acute distress, and she did not witness anything to make her think Mrs. Jones was a threat to herself or anyone else. Dkt. No. 60 at 79-80. Nurse Bass was aware of the signs and symptoms of withdrawal based on her training from the policy and protocol procedures she received in her work handbook. Dkt. No. 56-1 ¶ 9; Dkt. No. 60 at 19-19. Lastly, Nurse Bass did not order Mrs. Jones's medical records after meeting with her and did not order any medications to be administered to Mrs. Jones. Dkt. No. 60 at 28, 47-48.

Nurse Bass maintained in her deposition that she could not order Mrs. Jones's medical and prescription records because Mrs. Jones had neglected to sign the proper authorization form. Dkt. No. 60 at 48-49. However, Dr. Anderson in his deposition said that the authorization form that Mrs. Jones's signed enabled Nurse Bass to get the records. Dkt. No. 63 at 58. Dr. Anderson and Plaintiff's expert, Dr. John May, testified that Nurse Bass should

AO 72A
(Rev. 8/82)

have ordered the records in this case. Dkt. No. 63 at 62; Dkt. No. 72-1 at 2-4. Nurse Bass maintained that she treated Mrs. Jones just like any other inmate who enters the jail and did not refuse to treat any medical need claimed by Mrs. Jones. Dkt. No. 60 at 91-92.

After her medical intake screening, Mrs. Jones was released into the general population of the jail. Her bunkmate was Josie Lee Travis ("Ms. Travis"). Dkt. No. 56-1 ¶ 28. Ms. Travis testified that she observed Mrs. Jones staying in bed during her detention, not eating, and appearing clammy. Dkt. No. 62-1 at 8. However, Mrs. Jones did travel to Atkinson County to be booked and processed for an outstanding warrant the morning after she was brought to the Coffee County Jail. Dkt. No. 56-1 ¶ 29-30. While in Atkinson County, Sheriff's Assistant Wendy Funderburk claimed in an affidavit that she had a conversation with Mrs. Jones and observed that she was in a "very good mood," did not look "ill," and appeared "fine." Dkt. No. 57; Dkt. No. 56-1 ¶ 30. Mrs. Jones returned to Coffee County Jail by 12:53 p.m. later that day. Dkt. No. 56-1 ¶ 30. That evening, Mrs. Jones attended a church service in the jail at 6:00 p.m. hosted by Jan Boettcher. Dkt. No. 56-1 ¶ 31; Dkt. No. 62 at 22. At this service, Ms. Travis testified that Mrs. Jones "got saved" and told the other inmates in attendance about her baby. Dkt. No. 62 at 22. Jan Boettcher stated in her affidavit that Mrs. Jones was one of the first

AO 72A
(Rev. 8/82)

inmates through the door, was engaged and interested, and was "full of life, vibrant, and energetic." Dkt. No. 58.

But, at some point after the church service, on the evening of July 10th, Ms. Travis testified that she inquired as to why Mrs. Jones was not eating and was sleeping so much. Dkt. No. 56-1 ¶ 38; Dkt. No. 62 at 23. Mrs. Jones responded that "she's coming off [Subutex] and Xanax." Dkt. No. 62 at 23. Ms. Travis told Mrs. Jones that she should see a nurse to which Mrs. Jones replied that she had been trying, and although Ms. Travis testified that she had seen Mrs. Jones go to the intercom button to call someone at the jail, she did not know what Mrs. Jones had said. Dkt. No. 62 at 23-34. Later, around 12:37 a.m., Ms. Travis awoke to see Mrs. Jones experiencing convulsions and breathing hard. Dkt. No. 62-3; Dkt. No. 56-1 ¶ 52. Ms. Travis also stated that she saw Mrs. Jones hit the wall and noticed that she could not move. Dkt. No. 62-3; Dkt. No. 56-1 ¶ 52. Ms. Travis pushed an alarm button and called for help. When help arrived, Mrs. Jones was found unresponsive and not breathing. Dkt. No. 60-7 at 4. The jailors that found her began resuscitation efforts and called EMS. Id. Mrs. Jones was transported to Coffee Regional Medical Center where

AO 72A
(Rev. 8/82)

she died a few days later on July 15, 2015. Id.; Dkt. No. 52-1 ¶ 3.

The GBI performed an autopsy and concluded that:

> Given the investigative findings of the decedent telling her cellmate that she (the decedent) was 'coming off' of Xanax and Subutex, the cellmates [sic] statement that the decedent was sleeping and not eating for the past two days, and the cellmate witnessing of the decedent's seizure-type activity, the hospital clinical diagnosis of anoxic encephalopathy, the negative hospital admission blood toxicology, and the lack of cause of death-specific autopsy findings, the decedent's cause of death is most likely due to drug withdraw syndrome with seizure resulting from the decedent's sudden stoppage of Xanax and Subutex. Since drug withdraw syndrome with seizure cannot be proven at autopsy, the decedent's manner of death is best classified as undetermined.

Dkt. No. 60-7 at 4. At the time Mrs. Jones entered Coffee County Jail, she had active prescriptions prescribed by Dr. Khan for Xanax, Subutex, Lexapro, Neurontin, and Seroquel. Dkt. No. 60-6 at 1. However, Nurse Bass testified that Mrs. Jones did not tell her that she had active prescriptions for those medications. Dkt. No. 60 at 78-79.

Captain Phillips testified that the policy in Coffee County Jail was that during a medical emergency, jailers are supposed to notify medical staff that is on call and dial 911 to get EMS. Dkt. No. 66 at 22. Additionally, the jail's policy was if alcohol or drug abuse related problems are identified, a jail nurse will refer the inmate to the jail's medical director. Dkt. No. 56-1 ¶ 72.

Finally, inmates could request to see medical staff at a kiosk provided by the jail. Id. ¶ 63.

### III. Procedural History

Plaintiff Cedric Jones instigated this action against multiple defendants as the surviving spouse of Mrs. Jones. Dkt. No. 1-2 at 2. Plaintiff sued Nurse Bass in her professional capacity for ordinary and professional negligence and in her individual capacity under 42 U.S.C. § 1983 for deliberate indifference to the medical needs of Mrs. Jones; Dr. Anderson in his professional capacity for negligence and professional negligence and in his individual capacity under § 1983 for deliberate indifference; SGCM for negligence and respondeat superior as well as deliberate indifference under § 1983; Captain Phillips in his individual capacity under § 1983 for deliberated indifference; and Sheriff Wooten in his individual capacity and his supervisory capacity under § 1983 for deliberate indifference. Dkt. No. 1-2 at 13-24, 35-38.

This case was removed from the State Court of Coffee County to this Court on June 1, 2017. On August 8, 2017, the parties were instructed to conduct discovery in two phases, with the first phase being limited to immunity issues. Dkt. No. 34. The summary judgement motions at issue in this order were limited to those immunity issues.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

AO 72A
(Rev. 8/82)

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I. Section 1983

Plaintiff sued the Defendants in this case under 42 U.S.C. § 1983 (2018) arguing that they were deliberately indifferent to the medical needs of Mrs. Jones in violation of the Fourteenth Amendment to the U.S. Constitution. In response, Defendants have moved for summary judgment based on various immunity defenses.

Section 1983 imposes liability on one "who, under color of any statute, ordinance, regulation, custom, or usage, of any State

or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." "To establish a claim under [§ 1983], a plaintiff must prove: (1) a violation of a constitutional right; and (2) that the alleged violation was committed by a person acting under the color of state law or a private individual who conspired with state actors." Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016). Id. "The Supreme Court has interpreted the Eighth Amendment to prohibit 'deliberate indifference to serious medical needs of prisoners.'" Id. (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). Mrs. Jones was a pre-trial detainee, and the Eleventh Circuit has analyzed the rights of such detainees under the Due Process Clause of the Fourteenth Amendment. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009); Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). But, the Eleventh Circuit has clarified that a pre-trial detainee's deliberate indifference claim is "subject to the same scrutiny as if they had been brought . . . under the Eighth Amendment." Mann, 588 F.3d at 1306; see also Goebert, 510 F.3d at 1326.

## II. Qualified Immunity

In response to Plaintiff's § 1983 claims, Nurse Bass and Sheriff Wooten argue that such claims are barred against them under

the doctrine of qualified immunity. "Qualified immunity insulates government actors, in their individual capacities, from civil lawsuits as long as the challenged discretionary conduct does not violate clearly established federal statutory or constitutional rights." Adams v. Poag, 61 F.3d 1537, 1542 (11th Cir. 1995). The doctrine protects "all but the plainly incompetent or one who is knowingly violating the federal law." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.2002)).

For qualified immunity to apply, a defendant must show that he or she was a state actor engaged in a discretionary function within the scope of his or her authority at the time of the alleged violation. Maggio v. Sipple, 211 F.3d 1346, 1350 (11th Cir. 2000). If the defendant meets this threshold issue, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity by satisfying a two-part inquiry. Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005). First, he must show that the defendants violated a constitutional right. Id. This step requires a court to analyze the specific constitutional right at issue and decide as a matter of law if the defendants violated such a right. If such violation occurred, he must show that the right was clearly established at the time of the incident. Id.

AO 72A
(Rev. 8/82)

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent." Id. In conducing this analysis, the Court looks to precedent set forth by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia. Melton, 541 F.3d at 1221. While a case with materially identical facts is not necessary, "the preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010). Finally, "[m]ore than a general legal proposition . . . is usually required; if a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question. Minor variations between cases may prove critical." Id. (citations omitted); see also Goebert, 510 F.3d at 1330 ("The more general the statement of law is that puts the official on notice, the more egregious the violation must be . . .").

In conducting a qualified immunity analysis, the Court has discretion to address either the constitutional violation prong or the clearly established prong first depending on the circumstances of a particular case. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

## A. Nurse Bass

Although Nurse Bass is not a "public employee[] in the strict sense of the term" for qualified immunity purposes, "[w]here a function that traditionally falls within the exclusive purview of a state entity is delegated to a private entity, state action is present." Adams, 61 F.3d at 1542 n.2 (applying the qualified immunity analysis to medical professionals who contracted to provide medical services to a state prison). Here, neither party disputes that a qualified immunity analysis is appropriate for Nurse Bass. Additionally, Plaintiff does not dispute that Nurse Bass, as an employee of SGCM, was a state actor acting within the scope of her discretionary authority when she conducted the intake evaluation of Mrs. Jones. As such, the burden shifts to Plaintiff to show that Nurse Bass violated a clearly established constitutional right. The Court will look first to whether Nurse Bass violated Mrs. Jones's constitutional rights.

The constitutional right at issue here is the right to adequate medical care under the Fourteenth Amendment. Plaintiff claims that Nurse Bass was deliberately indifferent to her serious medical needs in violation of that amendment. To prevail on a claim of deliberate indifference to a serious medical need, a plaintiff must show "(1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between

that indifference and the plaintiff's injury." <u>Melton</u>, 841 F.3d at 1220. Neither party addressed the final causation element.

### 1. Serious Medical Need

In the Eleventh Circuit, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Melton</u>, 841 F.3d at 1221–22 (citations omitted). "To constitute a serious medical need, 'the medical need must be one that, if left unattended, poses a substantial risk of serious harm.'" <u>Id.</u> at 1222 (citations omitted).

Based on the evidence in this case, Mrs. Jones did not have a serious medical need at the time when Nurse Bass evaluated her. Plaintiff characterizes the serious medical need at issue in this case as her mental health disorders of bi-polar disorder, manic depression, and borderline personality disorder that were diagnosed by Dr. Khan. However, the harm alleged by the Plaintiff is that Mrs. Jones died from drug withdrawal syndrome, not her mental health disorders. Thus, the alleged serious medical need in this case was drug withdrawal syndrome. There is no evidence in the record that a physician had diagnosed Mrs. Jones with a risk for drug withdrawal syndrome. As such, Plaintiff must show that Mrs. Jones's serious medical need was "so obvious that even a lay person would easily recognize the necessity for a doctor's

AO 72A
(Rev. 8/82)

attention." See Johnson v. City of Bessemer, No. 17-13122, 2018 WL 3359672, at *4 (11th Cir. July 10, 2018). In analyzing this issue, we look at whether the facts show it would have been "so obvious" to a lay person that Mrs. Jones needed medical attention when she was being evaluated by Mrs. Jones. See id. at *4-*5 (analyzing the serious medical need issue based on facts known to the jailor at the time of the inmates detention).

Stoner v. Fye, No. 5:15-CV-102 (CAR), 2017 WL 1294439 (M.D. Ga. Mar. 31, 2017), is instructive on this point. In Stoner, one of the defendant doctors argued that the plaintiff could not show a serious medical need because the plaintiff was not showing symptoms of withdrawal when the doctor visited him. Id. at *5. The court disagreed citing the facts that the doctor was told by a nurse (and the plaintiff) that the plaintiff was taking medications including Xanax, that he was at risk of having a seizure without those medications, and that he was ultimately found unresponsive in his cell due to a benzodiazepine-withdrawal seizure. Id. at *5-*6. The court pointed out that the plaintiff had entered the Georgia Department of Corrections with active prescriptions that were well documented in his file along with information about his risk for seizures and his complaint of feeling disoriented from not being given his medication. Id. at *5. He was specifically transferred to a facility with 24-hour nursing care because of his risk for benzodiazepine withdrawals.

AO 72A
(Rev. 8/82)

_Id._ Finally, the doctor specifically referred to the plaintiff as having a "serious health condition." _Id._ at *6. Based on these facts, the court found that the plaintiff "had an objectively serious medical need on [the day] . . . Dr. Fitz-Henley saw him." _Id._

While superficially similar in some respects, the facts of this case are materially distinguishable from _Stoner_. Most importantly, it was not so obvious that a lay person would know Mrs. Jones was at risk for or was experiencing withdrawal syndrome when she met with Nurse Bass. Indeed, lay people such as Jan Boettcher and Wendy Funderburk observed her to be "fine" and "full of life." Dkt. Nos. 57, 58. Nurse Bass testified that Mrs. Jones was not exhibiting any symptoms of withdrawal during the intake evaluation, and unlike the doctor in _Stoner_, Nurse Bass had no knowledge of Mrs. Jones's prescriptions or of any concern for withdrawal. The only medication that Mrs. Jones told Nurse Bass she was taking was Subutex, and Nurse Bass stated she was unaware that Subutex could cause withdrawals. While the plaintiff in _Stoner_ had communicated his prescriptions and withdrawal symptoms to the doctor, there is no evidence that Mrs. Jones communicated such information to Nurse Bass in this case.

Plaintiff argues that Nurse Bass was aware that Mrs. Jones had active prescription medications since Nurse Bass indicated Mrs. Jones had taken or was taking prescriptions on the intake

form. However, Nurse Bass also testified that Mrs. Jones did not tell her what specific prescription medications she was taking. Instead, Nurse Bass testified that Mrs. Jones told her the *only* medication she was taking was the Subutex that Mrs. Jones said she did not have a prescription for. General knowledge that an inmate has unknown prescriptions that she might be taking or may have taken in the past does not rise to the level of being so obvious that a lay person would easily recognize the need for a doctor's attention. See Johnson, 2018 WL 3359672 at *4-*5 (finding that even though a jailor believed an inmate was under the influence of drugs, the fact that the inmate was breathing and appeared to be sleeping deeply every time she was checked on showed that her need for medical treatment was not so obvious that a lay person would recognize it).

Plaintiff cites two cases involving withdrawal from alcohol to support the serious medical need argument. In both cases, the decedents demonstrated obvious symptoms of inebriation followed by severe withdrawal symptoms that the defendants witnessed. Lancaster v. Monroe Cty., 116 F.3d 1419, 1420-23 (11th Cir. 1997); Harper v. Lawrence Cty., 592 F.3d 1227, 1230 (11th Cir. 2010). In addition, the defendants in Lancaster were made aware of the inmate's chronic alcoholism and recent hospital visit for seizures. 116 F.3d at 1420-23. Unlike both of these cases, Mrs. Jones displayed no obvious signs of withdrawal during her intake

with Nurse Bass, and after her intake, the evidence shows that although Mrs. Jones slept often, she was still awake and even active at multiple points during her time at the jail. See Johnson, 2018 WL 3359672 at *4-*5. (finding that an inmate sleeping heavily after being suspected of using drugs was not evidence of a serious medical need). Additionally, no one at the jail was specifically made aware of any risk of withdrawal for Mrs. Jones. Therefore, because it was not so obvious Mrs. Jones was experiencing withdrawal syndrome during her intake evaluation with Nurse Bass such that a lay person would have recognized the need for medical attention, the Court concludes that Mrs. Jones did not have a serious medical need at that time.

### 2.   Deliberate Indifference

Assuming *arguendo* that Plaintiff could show a serious medical need, he still fails to show that Nurse Bass was deliberately indifferent to that need. To establish deliberate indifference, a pre-trial detainee must show that the defendant (1) possessed subjective knowledge of a risk of serious harm; (2) disregarded that risk; (3) by conduct that is more than mere negligence. Melton, 841 at 1223. "Conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical

care that is so cursory as to amount to no treatment at all." Magwood v. Sec'y, Fla. Dep't of Corr., 652 F. App'x 841, 844 (11th Cir. 2016).

### a. Subjective Knowledge

First, Nurse Bass did not have subjective knowledge of a risk of serious harm "concerning the non-administration of prescription medication to Mrs. Jones." Dkt. No. 72 at 10. "Subjective knowledge of the risk requires that the defendant be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Johnson, 2018 WL 3359672 at *5 (quoting Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1280 (11th Cir. 2017)). First, Nurse Bass testified that she did not know that Mrs. Jones had active prescriptions for Xanax, Subutex, Lexapro, Neurontin, or Seroquel. While she stated that Mrs. Jones told her that she was taking Subutex, she also testified that Mrs. Jones told her it was being taken without a prescription. Although Nurse Bass indicated on the form that Mrs. Jones was taking medications prescribed to her, Nurse Bass testified that no medications were listed because Mrs. Jones did not tell her which medications she was taking. Finally, Nurse Bass testified that during the intake, Mrs. Jones was not exhibiting any symptoms consistent with withdrawal syndrome.

For Nurse Bass to have subjective knowledge of the risk of withdrawal, she would have to be aware of that risk. Here, based on her testimony and the intake form, it appears that she was not aware. General professional knowledge about mental health conditions and prescriptions would not be enough to put Nurse Bass on notice that Mrs. Jones must have been taking active prescription medication. Based on what Mrs. Jones told her, Nurse Bass had no reason to think that Mrs. Jones was taking other medications besides Subutex, which she believed to be not prescribed. For all she knew, Mrs. Jones could have been diagnosed with mental health conditions yet not currently taking medications.

Based on the intake form and Nurse Bass's testimony, the evidence shows that the only medication that Nurse Bass knew Mrs. Jones was taking was Subutex. Nurse Bass testified that she did not know that Subutex could cause withdrawals. In Jones v. City of Bessemer, the Eleventh Circuit found that even though a jailer suspected an inmate of being under the influence of drugs and had been told that she was taking Xanax, the jailor was not subjectively aware that the inmate was at a substantial risk of serious harm, in part, because he did not know the side effects of Xanax. 2018 WL 3359672 at *5. Similarly, here, Nurse Bass could not be subjectively aware that Mrs. Jones was at risk of harm if she did not know Subutex caused withdrawals or that she was taking other prescribed medications.

## b. Disregarding a Risk with Conduct That is

## More Than Mere Negligence

Even if she had subjective knowledge, Nurse Bass did not disregard any risk with conduct that is more than negligent. Plaintiff claims that by not ordering Mrs. Jones's medical and prescription records, Nurse Bass disregarded a risk of serious harm. It is true that Dr. Anderson testified that under the facts of this case, Nurse Bass should have ordered the records. Plaintiff's expert Dr. John May also stated that Nurse Bass should have ordered the records. Furthermore, Dr. Anderson testified that the form that Mrs. Jones signed was sufficient to obtain medical and prescription records.

However, even if this decision was erroneous considering her knowledge of Mrs. Jones's mental health conditions, Plaintiff has failed to prove that any error on Nurse Bass's part rose to any level above mere negligence. Plaintiff's expert, Dr. May asserts that Nurse Bass "failed to meet the standard of care" for medical professionals which constituted "professional negligence and a deliberate indifference to the medical needs" of Mrs. Jones, dkt. no. 72-1 at 2, but he does not explain how her conduct rose to a level above mere negligence.[3] With the information that Nurse Bass

---

[3] Nurse Bass also rightfully points out that Dr. May misconstrues certain facts in his expert report such as his statement that Nurse Bass "was made aware that . . . Mrs. Jones was prescribed medications by Dr. Khan for bipolar disorder and manic depressive disorder, but did not attempt to identify that medication or obtain it for Mrs. Jones." Dkt. No. 71-2. The record does not support this

AO 72A
(Rev. 8/82)

knew, failing to order medical records would not be "grossly inadequate care," and because the evidence shows that she performed the entire intake screening, her actions cannot be characterized as "medical care that is so cursory as to amount to no treatment at all." Magwood, 652 F. App'x at 844 (11th Cir. 2016).

Plaintiff cites several cases in support of his argument that Nurse Bass provided "grossly inadequate care," as well as care that is "so cursory to amount to no care at all." Dkt. No. 72 at 12. However, in each of these cases, the defendants knew specific information about the inmates' conditions and the prescriptions they were taking. See Waldrop v. Evans, 871 F.2d 1030, 1034 (11th Cir. 1989)(explaining that the doctor knew the inmate had psychiatric problems and was taking specific prescriptions to control those problems); Young v. City of Augusta, 59 F.3d 1160, 1164-65, 1169 n.17 (11th Cir. 1995)(explaining that jail personnel knew about the inmate's serious mental conditions but jail guards may not have given her medication as directed by ER physicians); Greason v. Kemp, 891 F.2d 829, 831-32, 835 (11th Cir. 1990) (explaining that although the institution holding an inmate with a history of mental illness had his clinical file which included

---

allegation. Rather, the record shows that Nurse Bass was aware that Mrs. Jones had been diagnosed with certain mental health conditions by Dr. Khan, and separately, that the intake form indicated Mrs. Jones had taken or was taking prescriptions. But, Nurse Bass testified that she indicated further down the form the only medication told to her, i.e., Subutex, which Nurse Bass understood to be unprescribed. Nevertheless, Dr. May's expert report fails to show that Nurse Bass was more than negligent in her actions.

letters from previous doctors describing the severity of his condition, a doctor discontinued active prescriptions without consulting the file or assessing his mental health status).  In addition, in two of these cases, the doctors actually stopped treatment of medications that they knew the inmates were actively taking.  See Waldrop, 871 F.2d at 1034; Greason, 891 F.2d at 832.  In Waldrop, one of the doctors "took no action" when he did not call the psychiatric doctor after a known-to-be seriously mentally ill inmate slit his wrists.  871 F.2d at 1035-36.  In Greason, the doctor made the conscious choice to end treatment of medications after meeting for just a few minutes and without consulting the patient's file, which was already at the medical institution where the inmate was housed.  891 F.2d at 831-32.  The doctor also did not conduct a mental examination.  Id. at 832.

Nurse Bass's actions are materially distinguishable.  First, she did not have specific information about what prescriptions Mrs. Jones was taking because she was limited by what information Mrs. Jones shared with her.  She also had no knowledge of any risk of withdrawal syndrome as Mrs. Jones was not exhibiting symptoms at the time of intake, which is different than the obvious serious medical need when a known mental health patient slits his wrists like in Waldrop.  Furthermore, there is a material difference between actively taking a patient off of known medications after

AO 72A
(Rev. 8/82)

a cursory interview in Greason and not continuing unknown medications in this case.

The facts of this case are tragic, and those charged with taking care of pre-trial detainees must provide proper medical care as required by the Fourteenth Amendment. However, Plaintiff in this case has failed to demonstrate that Nurse Bass was deliberately indifferent to a serious medical need. Even if Nurse Bass allegedly made a mistake by not ordering the medical prescription records, Plaintiff still fails to provide evidence that her conduct rises above the level of negligence.[4] For these reasons, there is no constitutional violation, and thus, Nurse Bass is entitled to qualified immunity from claims against her in her individual capacity.[5] Nurse Bass's motion for summary judgment with respect to Plaintiff's § 1983 claim is GRANTED.[6]

---

[4] To be clear, this Court has no opinion about whether Nurse Bass was in fact negligent. Rather, this Court merely finds that Plaintiff failed to show under the applicable test for deliberate indifference that Nurse Bass's conduct was more than negligent.

[5] Because we find that there was no constitutional violation, we need not address the second qualified immunity prong of whether a right was clearly established.

[6] There appears to be some confusion in the briefs over whether Plaintiff asserts any claims against Nurse Bass in her official capacity. However, Plaintiff makes clear in his response to Nurse Bass's motion for summary judgment that the § 1983 claim against nurse Bass involves only actions taken in her individual capacity. Thus, no such claims need be addressed since they do not exist.

AO 72A
Rev. 8/82)

## B. Sheriff Wooten

### 1. Individual Capacity Claim

Before beginning the qualified immunity analysis of Sheriff Wooten, it is important to note that Plaintiff filed claims against Sheriff Wooten in his individual capacity for his alleged direct involvement in this case and in his supervisory capacity. In his response to Sheriff Wooten's motion for summary judgment, Plaintiff agreed that the direct participation claims against Sheriff Wooten were not supported by the evidence. Dkt. No. 74 at 5. Therefore, Sheriff Wooten's motion for summary judgment with respect to claims under § 1983 for his direct participation in this case is GRANTED.

### 2. Supervisory Capacity Claim

Plaintiff claims that Sheriff Wooten, in his supervisory capacity, failed to sufficiently train his officers and failed to institute proper policies regarding proper investigation and treatment of inmate withdrawal syndrome that ultimately resulted in deliberate indifference to Mrs. Jones's medical care. In response, Sheriff Wooten asserts that these claims are barred by qualified immunity.[7]

___

[7] It is important to note that in his response to Sheriff Wooten's motion for summary judgment, Plaintiff attached an expert report of Michael A. Berg as evidence supporting his arguments. Dkt. No. 56-1. However, in deciding Sheriff Wooten and Kim Phillip's Motion to Strike the Opinions and Preclude the Testimony of Plaintiff's Expert, Michael A. Berg, the Honorable Stan Baker held that Mr. Berg's testimony would be strictly limited to the classification process for housing inmates. Dkt. No. 97 at 1-2. Judge Baker stated that "Plaintiff will not be permitted to introduce or otherwise rely on any other

AO 72A
(Rev. 8/82)

Plaintiffs may not sue supervisory officials under § 1983 based on theories of respondeat superior or vicarious liability. Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994). Instead, a supervisor may only be held liable for personal participation in a constitutional violation or where there is a causal connection between his actions and the alleged constitutional deprivation. Braddy v. Fla. Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998). "A causal connection can be established by, inter alia, 'facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (citations omitted).

Plaintiffs can prove a violation of supervisory liability in a few different ways: first, by showing that a defendant acting as a final decision maker promulgated an official policy that when executed gave rise to a constitutional violation, Arnold v. Bd. of Educ., 880 F.2d 305, 315 (11th Cir. 1989)(overruled on other grounds); Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996)("Only those officials who have final policymaking authority may render the municipality liable under § 1983.");[8] second, by

---

opinions from Mr. Berg." Id. at 2. Therefore, in reading the facts in a light most favorable to the Plaintiff in this case, Mr. Berg's testimony cannot be considered beyond the limits of that undisturbed order.

[8] The doctrines of municipal liability and supervisory liability are nearly identical. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1294 (11th

showing an established custom or practice that caused a violation of a constitutional right as evidenced by a pattern of "substantially similar" instances of unlawful behavior, see Mercado, 407 F.3d at 1161-62; and third, by showing a failure to train employees that amounted to deliberate indifference to the rights of persons with whom those employees come into contact, Gold v. City of Miami, 151 F.3d 1346, 1350-51 (11th Cir. 1998).

Here, Plaintiff argues that Sherriff Wooten is liable under his supervisory capacity because he failed to train jailors concerning drug or alcohol withdrawal. He argues that this lack of training evidenced a deliberate indifference to the rights of inmates. Finally, he asserts that this deliberate indifference is demonstrated by evidence of a widespread pattern of prior abuse and the obvious need for training.

The Court begins with the second prong of the qualified immunity analysis because it is clear from the outset that Plaintiff has failed to demonstrate that implementation of such training is a clearly established constitutional right. See Pearson, 555 U.S. at 236 (explaining that a district court has discretion to decide which qualified immunity prong to address first). Plaintiff does not dispute that Sheriff Wooten is a state actor who was acting within his discretionary authority in this

Cir. 2004) (quoting Greason, 891 F.2d at 837); Sampson v. City of Brunswick, No. CV 211-013, 2013 WL 12134188, at *7-*9 (S.D. Ga. Mar. 1, 2013).

AO 72A
(Rev. 8/82)

case. Thus, the burden shifts to Plaintiff to show that Sheriff Wooten violated a clearly established constitutional right and is therefore not entitled to qualified immunity.

Plaintiff failed to meet his burden because the law is not clearly established that a reasonable official in Sheriff Wooten's position would know that he was deliberately indifferent in violation of the Constitution by failing to train his jailors about the symptoms of withdrawal. Plaintiff states that his claims against Sheriff Wooten "arise[] out of the lack of training concerning withdrawal within the Coffee County Jail" and that "there is little question" he "had fair warning that [his] conduct violated the Constitution." Dkt. No. 74 at 11. To support this assertion, Plaintiff cites Adams v. Paog, 61 F.3d 1537 at 1543-44, for the proposition that "knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference." He also cites McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999), stating that "prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer."

The general statements of law in Adams and McElligott fail to demonstrate that the law was clearly established such that a reasonable officer in Sheriff Wooten's position would know that it was a constitutional violation to not train his jailers about

withdrawal syndrome. The broad statements of law from these cases would not put a reasonable official on notice that by relying on medical professionals contracted to provide medical services to inmates rather than training jailors about specific medical conditions like withdrawal syndrome was a violation of law. In fact, Sheriff Wooten cites cases from this Circuit that actually approve of a system where medical staff, rather than jailers, are responsible for handling medical issues. See Denham v. Corizon Health, Inc., 675 F. App'x 935, 942 (11th Cir. 2017) (explaining that it was not obvious that correctional officers needed medical training in Volusia County when officers were not permitted to perform medical duties except in emergency situations for which they had emergency training); Anderson v. Columbia Cty., No. CV 112-031, 2014 WL 8103792, at *21 (S.D. Ga. Mar. 31, 2014) (finding that where jail procedures relied primarily on medical professionals for addressing inmates' medical needs, "[t]he fact that alternative procedures, such as providing jail personnel with additional medical training, might have better addressed [an inmate's] particular needs does not show that [the Sheriff] was deliberately indifferent").

Plaintiff cites other cases for the proposition that "the obvious need for training by Defendants Wooten and Phillips can be found in this Circuit's prior precedent," dkt. no. 74 at 9, but these cases also fail to show a clearly established right to

AO 72A
(Rev. 8/82)

jailors being trained on withdrawal syndrome.  See Harper 592 F.3d
at 1235; Morrison v. Washington County, 700 F.2d 678, 685 (11th
Cir. 1983).  For instance, the Eleventh Circuit in Harper explained
that this circuit's case law "established that a jail official who
is aware of but ignores the dangers of acute alcohol withdrawal
and waits for a manifest emergency before obtaining medical care
is deliberately indifferent to the inmate's constitutional
rights."  592 F.3d at 1235 (citation omitted).  This statement of
law fails to put Sheriff Wooten on notice of the need to train his
jailors about withdrawal.  Rather, it establishes that when a
jailor is already aware that an inmate is experiencing alcohol
withdrawal, he must obtain medical care for the inmate, presumably
from medical professionals, or otherwise the jailor is
deliberately indifferent to that inmate's constitutional rights.

    Even if Plaintiff could show that the alleged right of
training jailers about the symptoms of withdrawal was clearly
established in this case, Sheriff Wooten would still be entitled
to qualified immunity because Plaintiff has failed to present
evidence showing that Sheriff Wooten was deliberately indifferent
to the need to train.  To prove a constitutional violation under
a supervisory liability claim, showing a failure to train is not
enough; rather, a plaintiff must show that an officer "knew of a
need to train and/or supervise in a particular area and . . . made
a deliberate choice not to take any action." Gold, 151 F.3d at

AO 72A
(Rev. 8/82)

1350-51 (11th Cir. 1998). For an officer to be aware of a need to train, he must be aware of "a history of widespread prior abuse." Id. at 1351 (citation omitted). Alternatively, the need for training must be "so obvious" that the failure to train amounts to deliberate indifference. Id. at 1352.

In this case, Plaintiff failed to show that Sheriff Wooten knew of a need to train. Instead, the evidence shows that Coffee County Jail contracted with medical professionals to provide care to patients, rather than have jailors do it themselves, and required those jailors to notify the medical professionals when they were aware of an inmate's medical emergency. The jail also had a kiosk system in place that allowed inmates to self-report medical issues to the medical staff. There is no evidence that any jailers were made aware of symptoms of withdrawal prior to the alarm button being pressed by Mrs. Jones's roommate, Ms. Travis. When notified, the jailors promptly began emergency procedures. Based on the clearly established law of this circuit, a reasonable official in Sheriff Wooten's position would have no reason to think that such a system would violate an inmate's Constitutional rights. Furthermore, there is no evidence of any widespread pattern of abuse nor obvious need for training. Although the record shows that prior instances of withdrawal had occurred in the jail, no inmate has previously died as a result. Dkt. No 56-1 ¶ 83; Dkt. No. 63 at 77. Thus, Sheriff Wooten would not know of a need to

AO 72A
(Rev. 8/82)

train since the system he had in place of using medical staff to provide medical care appeared to be working. As a result, Plaintiff has failed to show that Sheriff Wooten was deliberately indifferent, which means he did not violate Mrs. Jones's constitutional rights. For these reasons, Sheriff Wooten is entitled to qualified immunity under both prongs of the analysis, and his motion for summary judgment is GRANTED.

### III. Plaintiff's Municipal Liability Claim Against SGCM

Plaintiff brings claims against SGCM under § 1983 for deliberate indifference under the Fourteenth Amendment. Specifically, Plaintiff argues that SGCM is liable under a theory of municipal liability asserting that SGCM through its contract with Coffee County to provide medical services to inmates at the Coffee County jail was the "functional equivalent of the municipality" of Coffee County and "therefore, subject to liability under [§ 1983] for constitutional violations . . . arising from its policies or customs." Dkt. No. 73; see Monell v. Department of Social Services, 436 U.S. 658, 690-91 (1978) (setting the standard for municipal liability). In response, SGCM asserts defenses of sovereign immunity under the Georgia Constitution and sovereign immunity under the Eleventh Amendment.

However, the Court need not decide the immunity defenses raised by SGCM because we have found no underlying constitutional violation in this case. When a plaintiff claims that a municipal

defendant had a custom or policy of failing to train its officers under § 1983, a defendant is only liable where "the failure to train amounted to 'deliberate indifference' to the rights of persons with whom [officers] come into contact." <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 123-24 (1992). However, the Eleventh Circuit has held that "[a]nalysis of a state entity's custom or policy is unnecessary . . . when no constitutional violation has occurred." <u>Garczynski v. Bradshaw</u>, 573 F.3d 1158, 1170-71 (11th Cir. 2009); <u>see also</u> <u>Rooney v. Watson</u>, 101 F.3d 1378, 1381 (11th Cir.1996)("Since we have determined that Deputy Watson's conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom relating to patrol vehicle operation and training."); <u>Smith v. Smith</u>, No. CV 307-024, 2009 WL 256007, at *6 (S.D. Ga. Feb. 3, 2009)("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred.").

Here, the Court found that Nurse Bass, as an employee of SGCM, did not violate Mrs. Jones's constitutional rights. Furthermore, Dr. Anderson, the founder of SGCM, was voluntarily dismissed from this lawsuit. Therefore, because there is no underlying constitutional violation, the Court has no occasion to address Plaintiff's municipal liability claim against SGCM. As municipal liability is the only basis for Plaintiff's § 1983 claim against

SGCM, SGCM's motion for summary judgment with respect to Plaintiff's § 1983 claim is GRANTED.

## IV. Other Parties and Claims

### A. Captain Phillips

In his complaint, Plaintiff asserts claims against Captain Phillips in his individual capacity under § 1983 for deliberate indifference. In his response to Captain Phillips's motion for summary judgment, Plaintiff agreed that the direct participation claims against Captain Phillips were not supported by the evidence. Dkt. No. 74 at 5. Therefore, Captain Phillip's motion for summary judgment with respect to claims under § 1983 for his direct participation in this case is GRANTED.[9]

### B. Dr. Anderson

Plaintiff brought state law claims of negligence against Dr. Anderson in his professional capacity and federal claims of deliberate indifference against him under § 1983 in his individual capacity. In his response to Dr. Anderson's motion for summary judgment, Plaintiff agreed to dismiss Dr. Anderson from this action. Dkt. No. 73 at 5. Therefore, all claims against Dr. Anderson in this case are DISMISSED.

---

9 Plaintiff filed a motion to amend the complaint to add a claim of supervisory liability against Captain Phillips. Dkt. No. 40. However, the Magistrate Judge denied that motion. Dkt. No. 95. As such, the only claim against Captain Phillips was the individual capacity claim for deliberate indifference.

## C. Remaining State Law Claims

Although Plaintiff sets forth state law claims for ordinary and professional negligence against Nurse Bass and for negligence and respondeat superior against SGCM, the Court has discretion to decide whether to hear supplemental state law claims. See 28 U.S.C. § 1367. "Courts are encouraged to avoid exercising supplemental jurisdiction when original jurisdiction is lacking." Gray v. Royal, 181 F. Supp. 3d 1238, 1254 (S.D. Ga. 2016); see also 28 U.S.C. § 1367(c)(3) (allowing a court to decline to exercise supplemental jurisdiction over a claim over which it has supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction"); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). Here, the Court granted each Defendant's motion for summary judgment regarding the federal § 1983 claims against them. Therefore, only state law claims against Nurse Bass and SGCM remain. Because no federal cause of action remains in this suit, Plaintiff's state law claims are REMANDED back to the state court pursuant to 28 U.S.C. § 1367(c)(3).[10]

---

10  Where a case "was originally filed in state court and removed to federal court under § 1441, the district court should . . . remand[] [the] state law

AO 72A
(Rev. 8/82)

## CONCLUSION

Nurse Bass and SGCM's Motions for Summary Judgment, dkt. nos. 52 and 53, with respect to Plaintiff's federal law claims under 42 U.S.C. § 1983 are **GRANTED**. Plaintiff's state law claims against Nurse Bass and SGCM are **REMANDED** to the State Court of Coffee County. Captain Phillips's Motion for Summary Judgment, dkt. no. 56, is **GRANTED**. Sheriff Wooten's Motion for Summary Judgment, dkt. no. 56, is **GRANTED**. Plaintiff's claims against Dr. Anderson are **DISMISSED**.

**SO ORDERED**, this 30th day of September, 2018.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

. . . claims to the state court, rather than dismissing them with prejudice." Pace v. Peters, 524 F. App'x 532, 538 (11th Cir. 2013).